**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL COVALESKI,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 15-0126** |
| | : | |
| **HEWLETT-PACKARD COMPANY,** | : | |
| **Defendant.** | : | |

**MCHUGH, J.**                                                                                    **JUNE 20, 2016**

## MEMORANDUM

Plaintiff Michael Covaleski brings this suit against his former employer, Defendant Hewlett-Packard ("HP"), alleging age and disability discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the Pennsylvania Human Relations Act ("PHRA"). Defendant has moved for summary judgment on all claims. Because Plaintiff has failed to produce sufficient evidence that the sole decision-maker had knowledge of his alleged disability at the time the adverse decision was made, I will grant summary judgment in part. Plaintiff's age discrimination claims, however, present material factual disputes warranting submission to a jury.

### I.      Factual Background[1]

Covaleski was born on May 28, 1957. He earned a degree in Electronics Technology from Lincoln Technical Institute in the 1980s and has worked in the technology industry for almost his entire career. In 1996, Covaleski began working for Neoware Systems Inc. ("Neoware"), where he first held the position of Customer Service Manager until he was

---

[1] The factual record in this case is dense, and all papers related to the current Motion have been filed under seal pursuant to the parties' Stipulated Protective Order. I have reviewed the entirety of the record but provide merely a summary of key facts for purposes of my analysis.

promoted to Director of Customer Service, a position he held from 2000 to 2007.  While at Neoware, Covaleski was responsible for management and technical support.  In 2007, Neoware was acquired by HP.

While employed by HP, Covaleski worked in several different positions, all within the 3LS Department (i.e., Third Level Support), a subgroup of the Total Customer Experience and Quality ("TCEQ") organization.  Effective April 1, 2010, Covaleski reported to Andy Stuart. Covaleski generally received positive reviews from his superiors throughout his career, including a positive review from Stuart in October of 2010.

In 2010, HP conducted a Voices of the Workplace ("VOW") survey in which employees confidentially rated their managers.  Stuart received the 2010 VOW results for his direct reports who were supervisors, including Covaleski.  Covaleski had the lowest scores of all the results that went to Stuart.  Of the thirty-eight areas in which Covaleski's subordinates rated him in the 2010 VOW, he received seventeen results that were coded in red for "significantly below" others and did not receive a single result that was significantly above the comparison group.  October 29, 2015 Deposition of Plaintiff Michael Covaleski at Exhibit 22.  Stuart shared these results with Covaleski in early 2011 and told him they needed to improve.

From 2011–2013, HP contracted with outside companies Sedgwick and Hewitt to manage different aspects of employee medical leave, such as short-term disability leave. Sedgwick acted as the third-party claims administrator for leave applications.  In that role, Sedgwick received employee medical records directly and did not communicate any medical information to HP management.  Rather, Sedgwick communicated limited information to Hewitt, including leave requests and approvals and return-to-work notifications.  Hewitt was then

2

responsible for communicating the limited information it received from Sedgwick to the HP's employee's manager as listed on Defendant's Human Resources ("HR") records.

In March of 2011, Covaleski sought medical treatment due to chronic lower back pain caused by a herniated disc. Plaintiff needed surgery to treat his back condition and accordingly requested short-term disability leave. In accordance with HP's third-party contracts, Sedgwick received all of Covaleski's medical records and approved his leave request, and his manager only received generic information about his leave, such as his leave approval for short-term disability leave and return-to-work-date. These notices did not provide a diagnosis or description of his medical condition.

Upon receiving approval, Covaleski took a medical leave of absence effective July 30, 2011 and underwent corrective back surgery on August 16, 2011. He chose to inform Stuart of his medical issues and treatment plan. Unfortunately, the surgery did not correct the problem, as his disc re-herniated within five days of surgery, requiring a second surgery on September 1, 2011. Following those surgeries, Covaleski was cleared by his neurosurgeon, Dr. Paul Marcotte of Penn Medicine, to "return to work full duty and without restrictions on Monday, 10/10/2011." Pl. Dep. at Exhibit 11. The letter clearing Covaleski to return to work further stated, "He has made an excellent recovery despite the need for revision surgery." *Id.* In accordance with his doctor's orders, Covaleski returned to work on October 10, 2011.

In September of 2011, while Plaintiff was out on short-term disability leave, Covaleski's supervisor changed to Wyatt Davis due to a shift in Defendant's reporting structure. Within weeks of returning to work, Covaleski learned that his overall performance for 2011 was rated as Partially Achieves Expectations ("PA"). While the review was signed by Davis, Stuart provided input as Covaleski's supervisor for the majority of the year. Under "manager summary of

performance," Stuart noted, "2011 was a tough year for Mike.  At the beginning of the year the VOW results were made available and Mike's team scores were very low across all areas."  Pl. Dep. at Exhibit 24.  In turn, Covaleski received a PA rating as a manager.  As an individual contributor, Covaleski was rated Achieves Expectations ("AE"), which resulted in a combined overall rating of PA.  The time period when Covaleski acted as a manager—which allegedly led to his negative VOW survey results and corresponding PA manager rating—predated his short-term disability leave.

In May of 2012, Defendant began offering an Enhanced Early Retirement ("EER") Program to eligible employees.  Employees with at least sixty-five points were eligible to participate.  The points scale took into account the employee's age plus years of service.  The program was not offered to any employees under the age of forty, as those employees were not eligible to participate.  On May 23, 2012, Covaleski received a letter offer from the HP Vice President of HR to participate in the EER Program.  The letter explained that the program was "entirely voluntary."  Plaintiff's Opposition Brief at Exhibit K.  Covaleski did not choose to participate in the EER program despite his eligibility.

During the period where Davis supervised Covaleski, Davis was impressed with Covaleski's presentation skills and work ethic.  In late summer or early fall 2012, Covaleski began reporting to Andrew Lamb.  Lamb, then forty-three, had been recently promoted from a manager role to the Director of 3LS.  Although Lamb was unaware of Covaleski's exact age, he thought Covaleski was around fifty based on his physical appearance.  Covaleski was Lamb's oldest direct report and one of the oldest employees in all of 3LS.  Lamb never read or saw Covaleski's 2011 performance review, but knew generally that he received an overall performance rating of PA for 2011.  He also received general feedback from 3LS managers,

4

including Davis, and Covaleski's peers.  Such feedback was mixed; Lamb learned that
Covaleski's work was "extremely detailed," but that "it took a considerable amount of time to
get that work done and [that the] delivery of the information was complex and could have been
simplified."  July 29, 2015 Deposition of Andrew Lamb at 88:9–25.  Lamb testified that he
observed Covaleski while he reported to Davis and developed his own opinion that his work was
"longwinded and overcomplicated."  Lamb Dep. at 94:17–22.  However, Lamb also testified that
his interactions with Covaleski were generally positive and that Covaleski was "interested in
where he could add some value to the company" and "[understand where HP was going with] the
next effort or the next program."  *Id.* at 94:3–16.

Covaleski learned of the new reporting structure when Lamb called him directly and said
"you'll be reporting to me and you will have a new job title."  Pl. Dep. at 80: 3–5.  Lamb
explained that although Covaleski was technically being demoted to a Quality Engineering
Expert (a demotion from his previous title of "Master"), Covaleski should continue to perform
the same job duties.  Lamb clarified that his title changed due to reorganization of the company
but his responsibilities remained the same.

In the fall of 2012, Davis informed Covaleski he would be rated AE.  At some point
thereafter following multiple 3LS management meetings regarding the performance of 3LS
employees, Covaleski's rating was downgraded to PA.  Lamb's goal for these meetings was to
achieve consistency in the performance grading across the entire 3LS Department.  Four other
3LS employees also had their preliminary 2012 ratings downgraded as a result of management's
performance review meetings.

From October 10, 2011 until the middle of November 2012, Covaleski concedes that his
activities of daily living were not limited, and he "was totally able to function."  Pl. Dep. at

362:11–364:19.  However, in November 2012, Covaleski began experiencing pain from a second recurrent herniated disc, requiring a second surgery and corresponding leave of absence from January 16, 2013 until June 10, 2013.  In January 2013, Lamb learned for the first time that Covaleski was going out on leave to have back surgery but did not have any further details about Covaleski's back condition.  Lamb Dep. at 220:12–22.  Before January 2013, Lamb did not know that Covaleski had a back condition or had ever taken medical leave from work.  March 4, 2016 Declaration of Andrew Lamb at ¶ 3; *see also* Lamb Dep. at 91.  Covaleski's testimony confirms that Plaintiff did not inform Lamb orally or in writing about his back condition prior to his second leave of absence.  Pl. Dep. at 145:15–19 ("Q. At any point in time before you began your leave in January of 2013 did you tell Andrew Lamb in writing or orally anything about your back condition?  A. No.  I couldn't reach Andrew Lamb."); *see also id.* at 107:15–16 (describing Sedgwick as "the claims people for HP").  Lamb repeatedly testified that he did not consider Covaleski disabled and did not know he had any impairments prior to January 2013.  *See, e.g.,* Lamb Dep. at 217–221 ("As I said earlier, I didn't know Michael actually had a disability.").

On June 3, 2013, Covaleski had a follow up visit with Dr. Marcotte.  Dr. Marcotte's "Progress Notes" from that visit read: "Mr. Covaleski returns to the office for reassessment.  He is approximately 4-1/2 months post lumbar exploration and fusion.  His preoperative leg pain had [sic] resolved."  Pl. Dep. at Exhibit 17.  Covaleski was cleared to return to work "full time, no restrictions" on June 17, 2013.  *Id.* at Exhibit 18.  Covaleski testified during his deposition that he has not had any issues with his back other than minor pain easily resolved by stretching since returning to work following his second short-term disability leave.  *Id.* at 161:24–162:11.  Covaleski further testified that effective June 17, 2013, he had no limitations on his ability to

walk, bend, lift, perform manual tasks, stand, care for himself, hear, eat, sleep, speak, breathe, learn, read, concentrate, think, communicate, or work.  *Id.* at 168:2–169:22.

In October of 2012, Lamb began implementing a reorganization plan for the 3LS Department.  As part of the 3LS reorganization, Lamb planned to add a new unit called "BIOS." Lamb understood that his reorganization proposal had to contain business rationale for the BIOS engineering team and also suggest a funding source for adding a new unit without a budget increase.  Lamb proposed his reorganization plan to his boss via a PowerPoint presentation at a meeting in Taiwan held on or about October 24, 2012.  Lamb suggested that Covaleski and another employee, David Lau, both be terminated.  Lamb noted as part of the presentation that Covaleski did not possess the necessary skillset to be moved to one of the new roles in the BIOS unit.  Lamb's boss did not object to his reorganization plan.

Lamb certifies, "I decided to terminate Mr. Covaleski's employment because of his poor performance (as reflected in two consecutive PA ratings); my determination that 3LS had a pressing need for a BIOS engineering team; and my assessment that Mr. Covaleski did not have the skills to do the new BIOS engineering roles."  Lamb Decl. at ¶ 24.  As documented by e-mail correspondence with HR in December 2012, Lamb intended to code Covaleski's termination as a work force reduction ("WFR") so that he would receive severance.  After Lamb learned of Covaleski's medical leave in January 2013, he emailed HR to ask how his leave would impact the WFR plan previously set in motion.  HR informed Lamb that the separation plan would have to be deferred until Covaleski returned to work.  Lamb adhered to HR's instructions and waited to inform Covaleski of his termination until his return to work in June 2013.  Accordingly, although Lamb made the unilateral decision to terminate Covaleski in October 2012, he did not

provide notice until June 10, 2013.  Covaleski's last day of employment was August 16, 2013.
He was fifty-six at the time of discharge.

In order to staff the new BIOS unit, Lamb originally planned to move five employees
from their current roles, hire one outside candidate into the BIOS department, and hire five
recent college graduates.  *See* Plaintiff's Opposition Brief at Exhibit S.  Prior to the
reorganization, there were approximately seventy-six employees in 3LS spread over seven
departments.  Twenty-nine of those employees held the position of Quality Engineer, and
Covaleski was older than all but three employees with that job title.  The timing prevented Lamb
from hiring recent college graduates, but he did eventually hire at least seven employees into
3LS in connection with the reorganization, including substantially younger employees.

For example, Lamb hired two younger employees as Quality Engineers, which Plaintiff
characterizes as his former position.[2]  Specifically, Colin Smalley, then thirty-seven, joined the
3LS Department at HP in October 2012, and Thomas Reyes, then twenty-five, joined in June
2013.  Plaintiff's Opposition Brief at Exhibits T & U.  In addition, HP hired two substantially
younger employees into Covaleski's former sub-department, Process Excellence: (1) Natalie
Hanson, then twenty-two; and (2) Bensom Lim, then forty-three, a transfer.  *Id.*  Defendant did
not consider Covaleski for any of these positions.  *Id.*

Lamb terminated numerous other employees during his tenure as Director of 3LS.  In
November 2013, Lamb conducted a second reorganization of the 3LS Department, which led to
the termination of five more employees, all of whom were over the age of forty, including three
over the age of fifty.  *Id.* at Exhibits U & Y; November 16, 2014 Deposition of Michelle
Geohring at 166:3–25.

---

[2] Plaintiff clarifies that Defendant has six different tiers within the Quality Engineer position, ranging from entry
level (Quality Engineer I) to Master (Quality Engineer VI).  Plaintiff's Opposition Brief at 11 n.13.

## II.     Discussion

Defendant has moved for summary judgment, arguing it is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact warranting submission to a jury.  Fed. R. Civ. P. 56.  To defeat summary judgment, the non-movant must respond with facts of record that contradict the facts identified by the moving party and may not rest on mere denials.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 n.3 (1986); *First Nat'l Bank of Pa. v. Lincoln Nat'l Life Insurance Co.,* 824 F.2d 277, 282 (3d Cir. 1987).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  It is well established that all record evidence must be construed in the light most favorable to the non-moving party.  *Id.* at 261, n.2.

### a.  Disability Discrimination

Plaintiff claims he suffered disability discrimination under the ADA and the PHRA.[3]  "In order to make out a *prima facie* case of disability discrimination under the ADA, [Plaintiff] must establish that [he] (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability."  *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006).  Defendant maintains that Plaintiff cannot establish prongs one and three of this test as a matter of law.  I agree.

Defendant first argues that Covaleski was not disabled as defined by the statute.  Under the ADA, the term "disability" means "(A) a physical or mental impairment that substantially

---

[3] While preserving the right to argue that the PHRA should be interpreted more narrowly than the ADA regarding whether an individual is disabled, Defendant agrees that Plaintiff's ADA and PHRA claims may be considered simultaneously for purposes of this Motion.  Defendant's Brief at 25 n.15 (citing *Kelly v. Drexel Univ.*, 94. F.3d 102, 109 (3d Cir. 1996).

limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities . . . include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). The "regarded as" prong includes perceived impairments but explicitly excludes "impairments that are transitory and minor." 42 U.S.C. § 12102(3)(A) & (B). A transitory impairment is defined as "an impairment with an actual or expected duration of 6 months or less." *Id.* Indeed, the Third Circuit has clearly instructed that a "temporary non-chronic impairment of short duration is not a disability covered by the [ADA and PHRA]." *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012); *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002).

Here, the record is clear that Covaleski fully recovered from his back condition on two separate occasions. Although he suffered through two short-term periods of disability during which major life activities were substantially limited, Covaleski's back issues were fortunately treatable. Plaintiff's consistent testimony that he was not limited in his ability to work or function in any major life activities following his return to work in October 2011 compels the conclusion that he was not disabled at the time the adverse employment decision was made.

Regardless, even if I found that a reasonable juror could conclude that Covaleski has met the first prong of his *prima facie* claim of disability discrimination, Lamb, the sole decision-maker here, did not have any knowledge of Covaleski's back conditions or previous medical leave when he decided to terminate his employment. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) ("to establish discrimination because of a disability, an employer must know of the disability."). Viewing the record in its totality, the limited knowledge of other employees

at the time of the adverse decision cannot be imputed to Lamb.  *See Olson v. Gen. Elec. Aerospace*, 101 F.3d 947, 954 (3d Cir. 1996) (refusing to impute the knowledge of other employees to decision-maker).  Lamb had no knowledge of Covaleski's back condition or previous medical leave when he documented his decision to terminate Covaleski in October 2012.  Covaleski's own testimony corroborated Lamb's version of events, as he conceded that he did not tell Lamb orally or in writing about his back condition before his January 2013 leave.  This narrative is further consistent with HP's outside contracts with third-parties regarding claims administration and management.  Covaleski has not produced any admissible evidence to show knowledge on Lamb's part at the time he presented his PowerPoint proposal regarding reorganization of the 3LS Department.

Plaintiff's chief argument to try to salvage his disability discrimination claims is that his PA ratings in 2011 and 2012 were essentially contaminated by *Stuart's* knowledge of Covaleski's first medical leave.  Consequently, Plaintiff argues that a reasonable juror could infer that Covaleski's disability indirectly influenced Lamb's decision-making process, since Lamb admits to partially relying on Covaleski's annual performance reviews.  I remain unpersuaded by this argument for two reasons.

First, the VOW survey results predated Plaintiff's first short-term disability leave.  Stuart's commentary in the 2011 review directly states that Plaintiff had a "tough year" due to the VOW survey results, which in turn triggered a PA rating that was expressly related to Plaintiff's managerial duties.  Plaintiff still achieved a favorable AE rating for his individual contributions in 2011.  Pl. Dep. at Exhibit 24 ("As a manager Mike's performance was evaluated as Partially Achieves Expectations (PA) and as an individual contributor he was rated as Achieves Expectations (AE) with the combined [2011] rating of PA.").

Second, regarding Plaintiff's 2012 performance review, Covaleski admits that he was not suffering from any back issues for the vast majority of 2012.  His back condition flared up again for the first time in the middle of November 2012, but his second short-term disability leave did not commence until January of 2013.  In turn, again due to HP's outsourcing of claims administration and management, no information was passed on to Covaleski's supervisors regarding his need for medical leave until January 2013.  Moreover, the record is clear that Stuart was no longer supervising Plaintiff in 2012 and had not supervised him since before he took leave for the first time in the summer of 2011.  In turn, viewing the record evidence as a whole, no reasonable juror could infer discriminatory animus on Stuart's part infected the two performance reviews in question.

As underscored by Defendant and perhaps exemplified by Plaintiff's focus on Stuart's alleged indirect role in his termination, Plaintiff does not challenge the record evidence that Lamb had no actual knowledge of Covaleski's back condition or his 2011 medical leave when he made the decision in October 2012 to terminate his employment.  Thus, because Plaintiff has failed to put forward sufficient evidence to establish a *prima facie* case of disability discrimination, Defendant's Motion for Summary Judgment will be granted with regard to Plaintiff's disability discrimination claims brought under the ADA and the PHRA.

### b.  Age Discrimination

Plaintiff also asserts age discrimination claims under the ADEA and the PHRA.  In contrast to Plaintiff's disability claims, there are multiple material factual disputes that would allow a reasonable juror to rule in Plaintiff's favor, and Defendant's Motion will accordingly be denied as it relates to Plaintiff's age discrimination claims.

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Discrimination claims brought pursuant to Title VII, the ADEA, and the PHRA are all subject to the familiar *McDonnell Douglas* burden-shifting framework.  *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425–26 (3d Cir. 2013); *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) ("Because the prohibition against age discrimination contained in the ADEA is similar in text, tone, and purpose to that contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under ADEA.").

Plaintiff must initially establish a *prima facie* case of discrimination by a preponderance of the evidence.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).  Covaleski easily satisfies this burden, as the record shows that: (1) he was forty years of age or older (specifically, fifty-six at the time of termination); (2) the defendant took an adverse employment action against him; (3) he was qualified for the position in question; and (4) he was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.  *See Burton*, 707 F.3d at 426 (citing *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009)).

Plaintiff having established a *prima facie* case, the burden of production now shifts to HP to offer a legitimate, non-discriminatory reason for the adverse action.  *Burton*, 707 F.3d at 426; *Smith*, 589 F.3d at 690.  The Third Circuit has recognized that this burden is "minimal" and "relatively light."  *Burton*, 707 F.3d at 426 (citations omitted).  Defendant also easily meets its burden, as the record presents evidence, which, if taken as true, would permit a finding that Lamb decided to terminate Covaleski's employment for a non-discriminatory reason.  *Id.*

Because HP has successfully rebutted the presumption of discrimination raised by Plaintiff's *prima facie* case, Covaleski then bears the final burden to demonstrate by a preponderance of the evidence that HP's purported reasons for termination were pretext for unlawful age based discrimination.  *Sarullo*, 352 F.3d at 797; *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009) ("A plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.").

In order to demonstrate pretext, Covaleski "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427 (internal quotation marks and citation omitted); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 645 (3d Cir. 1998) ("For example, the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class."). So long as Plaintiff sets forth sufficient evidence to allow a factfinder to discredit the employer's justification, he "need not present additional evidence of discrimination beyond [his] prima facie case to survive summary judgment." *Burton*, 707 F.3d at 427 (citations omitted).  "This is because the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." *Id.*

Here, viewing the entire record in the light most favorable to Plaintiff as the non-moving party, he has set forth evidence that would allow a reasonable juror to conclude that Lamb's decision to terminate Covaleski was motivated by impermissible age bias. At the very least, there are genuine disputes as to key facts regarding age-based trends in the record regarding the hiring and firing of HP personnel, and specifically trends in Lamb's personnel decisions related to restructuring. Drawing every inference in Plaintiff's favor, a reasonable juror could conclude that Defendant's conduct over time suggests a preference to discharge older individuals in favor of hiring younger replacements. As merely one example, the same PowerPoint slide that documents Lamb's intent to fire Covaleski before learning of his back condition also memorializes Lamb's preference to hire five recent college graduates as part of his reorganization plan for the 3LS Department. Plaintiff's Opposition Brief at Exhibit S ("Other Planned moves and actions . . . Mike Covaleski not skilled for new available roles . . . Immediate recruitment . . . 5 FTE M24 college/ITT hires [d]istributed through team to cover transitions.").

Moreover, when pressed repeatedly during his deposition whether he had a preference between hiring a thirty-five-year-old candidate or an otherwise equal sixty-year-old candidate, Lamb ultimately admitted a preference for the younger candidate. Lamb Dep. at 71:15–73:13. Lamb emphasized that the question was unrealistic because there is "always a difference" between candidates, but admitted that the potential for "longevity and growth" of the younger individual would be better for the company. *Id.* Lamb further explained that if the younger candidate "stayed for a long time, if that person continued to grow, if that personal continued to deliver . . . there's a longer and probably more sustained deliverable back to the company over a longer period of time." *Id.* Lamb carefully limited his own testimony by stressing that there are "many, many, many, many 'ifs' in that statement." *Id.* However, Plaintiff still has a right to

argue to a jury, "Simply put, Mr. Lamb believed that young, inexperienced adults fit more into Defendant's future than a fifty-five (55) year old with seventeen (17) years of experience." Plaintiff's Opposition Brief at 23.  Stated differently, Plaintiff has a right to offer this testimony as compelling evidence that "Lamb harbors a discriminatory bias against older workers." Plaintiff's Sur-reply Brief at 2.

Though Plaintiff may face an uphill battle in convincing a jury that Lamb's decision was motivated by age-based bias or latent prejudice as opposed to a simple business decision motivated by the evolving needs of the 3LS Department, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  Thus, at this juncture, it is appropriate for a jury to assess the credibility of the parties and their witnesses, hear counsel's arguments, and weigh the evidence regarding Plaintiff's age discrimination claims accordingly.

**III.     Conclusion**

Based on the foregoing, Defendant's Motion for Summary Judgment will be denied in part as to Plaintiff's age discrimination claims and granted in part as to Plaintiff's disability discrimination claims.  An appropriate order follows.

_____ /s/ Gerald Austin McHugh
United States District Court Judge

16